ROWENA E. BURDETTE, *Administratrix, etc., et al.*

*v.*

MAUST COAL AND COKE CORPORATION, *etc., et al.*

(No. 13333)

Decided February 17, 1976.

*R. J. Thrift, Jr.,* for Thomas and McKenzies.

*Benjamin P. Brown* for Carl C. Holbert.

PER CURIAM:

This appeal involves a motion to reverse a final order of the Circuit Court of Greenbrier County which overruled the appellants' (plaintiffs below) motion to direct a verdict for them as to liability and to grant a new trial on the question of damages alone, or in the alternative, to set aside the jury verdict in favor of the appellees (defendants below) and to award appellants a new trial.

Three consolidated wrongful death actions were brought by the movants, Rowena E. Burdette, Helen F. McClung, and Hilda F. Walkup, administratrixes of their husbands' estates. Their husbands were killed in an accident on May 6, 1968 while mining coal for the Gauley Coal and Coke Company.

The record in this case is quite voluminous and reveals that a tremendous amount of testimony was presented during the two-week trial below. In 1960, two of the defendants below, Thomas and Eugene McKenzie, owned a tract of coal land, approximately 1200 acres in size, near Leivasy, West Virginia, in Nicholas County. For several years, they had operated on a small part of this tract an underground coal mine known as the Sugar

Grove Coal Company No. 4 Mine. In 1961, the McKenzies began negotiations to lease most of their property to Maust Coal and Coke Corporation, also a defendant below. Negotiations were carried on with the then president of Maust Corporation, Mr. Joe L. McQuade, and with a member of the board of directors of Maust Corporation, who was also its general counsel, Mr. Brooks Callaghan. In accordance with procedures established by Mr. Ray Maust, the principal stockholder and chairman of the board of directors of Maust Corporation, the lease was actually taken in the name of Cherry River Coal Company, a wholly owned subsidiary of the Maust Corporation. By the terms of the lease, dated April 24, 1962, Cherry River acquired a lease on the 1200 acre plus tract excepting 68 acres, which the McKenzies reserved for five years for their own mining operation, the Sugar Grove No. 4 Mine.

Prior to the making of the lease agreement, in May 1961, the McKenzies hired H. P. Thomas, of the Bennett, Naeve & Thomas Engineering Company, to do the surveying work for the Sugar Grove No. 4 mine workings. Thomas, who was also a defendant below, thereafter made maps for the McKenzies reflecting the results of his surveys. The plaintiffs alleged in their complaint that a particular map prepared by Thomas was incorrect; Thomas insisted throughout the trial that his surveying and mapping were not in error.

After the making of the lease agreement, and during the five-year reservation, the McKenzies continued mining the Sugar Grove No. 4 Mine; in fact, there was additional mining conducted across the reservation line. Apparently, at no time were maps of the No. 4 Mine updated to indicate these further penetrations under the property leased to and to be mined by the Maust interests. The McKenzies, however, gave Mr. Bill Hill, an engineer for the Maust interests, a copy of the map prepared by Mr. Thomas in 1961 which did reflect some penetrations under the land being leased to Cherry River Company. The McKenzies testified that in 1964, when

they gave the map to Hill, they warned him to approach this area which contained the penetrations with extreme caution. The McKenzies shut down their mine prior to the end of the five-year reservation. On April 24, 1967, the reserved area became subject to the lease to Cherry River and the McKenzie mine, at that time, was virtually full of water.

Meanwhile, the Maust Corporation, in the name of another wholly owned subsidiary, the Gauley Coal and Coke Company, commenced mining operations on the property. The Gauley Company was immune from this action because of compliance with the Workmen's Compensation laws. The engineering work for several of Maust Corporation's subsidiaries was performed by the engineering staff of Summersville Coal Company, also a defendant below and also a wholly owned subsidiary of Maust Corporation. Mr. Floyd Barnett, the Maust Corporation's Chief Engineer for the Southern Division, supervised all of the engineering work. In addition to supervising certain Summersville Company employees, he also supervised survey crew members of Gauley Coal and Coke Company and Cherry River Coal Company. Barnett, who was the successor to Mr. Hill at Hill's death, was listed on the payroll of the Summersville Company as its employee.

It was at station 4+40, an engineering reference point within the Saxsewell No. 8 mine, where one of Barnett's crew made a critical survey error causing the "Two Right Entry" to be about 90 feet off its intended course at the point the disaster occurred.

Chief Engineer Barnett, who was not a registered engineer, submitted maps on occasion to Mr. Carl C. Holbert, who was a registered engineer. Holbert, another defendant below, affixed his certification of accuracy and completeness, as required by law, to one map on January 3, 1967 and to another on January 15, 1968. On neither occasion did he visit or survey the mine itself.

The 1967 certified map of Sax No. 8 portrayed the abandoned mine workings of the McKenzie mine, while

the 1968 certified map did not. Apparently a copy of this 1968 map or a map very similar, which also did not depict the nearby abandoned mine, hung in the mining office on the date of the Saxsewell inundation. Frank Davis, the Sax No. 8 mine foreman and superintendent, relied upon this office map in his work. He testified that if he had been aware of the proximity of the McKenzie mine he would have placed drill holes in advance of the mining as a safety precaution. Such procedure would have led to the safe discovery of the exact location of the abandoned mine.

In any event, on May 6, 1968, the miners working inside the Sax No. 8 mine were unaware that they were anywhere near the abandoned McKenzie mine filled with water. When a continuous mining machine in Sax No. 8 cut through into the McKenzies' abandoned mine, an estimated thirty-five million gallons of water poured into the Sax No. 8 mine killing four men, three of whom were the plaintiffs' husbands.

Several issues were raised by the pleadings and the evidence presented at the lengthy trial. These issues primarily dealt with whether the various defendants were guilty of negligence and whether their alleged negligence proximately caused or contributed to the mine disaster. Following the plaintiffs' presentation of their case, the defendants moved for directed verdicts; the trial court overruled the defense motions as to all defendants except Carl C. Holbert, whom the court ruled not to be causally connected with the disaster. The case against all of the other defendants thereafter went to the jury which returned a verdict for the remaining defendants. The plaintiffs filed a motion requesting the court to set aside the verdict, to direct a verdict for the plaintiffs and to grant plaintiffs a new trial on the question of damages alone, or in the alternative to set aside the verdict and to award plaintiffs a new trial. The trial court overruled this motion and entered final judgment for the defendants by its order of January 15, 1972.

The appellants assert that the trial court committed several errors below. These assignments of error have framed the following issues for this Court's consideration:

1. Whether the trial court erred in refusing to allow the jury to take exhibits into the jury room.

2. Whether the trial court committed prejudicial error in refusing to give the jury several of plaintiffs' instructions or in giving to the jury, over plaintiffs' objections, several of defendants' instructions.

3. Whether the verdict returned by the jury was contrary to the law and evidence.

4. Whether the trial court erred in directing a verdict for Carl C. Holbert.

I

The general rule which applies to the first issue states that "[t]he court's action either in sending or refusing to send documents to the jury room will not be interfered with on appeal except in case of an abuse." 75 Am. Jur. 2d *Trials* §1025 (1974). *See also*, 89 C.J.S. *Trial* §465(d) (1955). West Virginia appears to follow this rule; *W. Va. Code* 1931, 56-6-23, provides: "Depositions or other papers read in evidence may, by leave of the court, be carried from the bar by the jury." In applying this particular statutory provision, this Court has held:

> "Section 12, chapter 131, Code, [now *W. Va. Code* 1931, 56-6-23, as amended] respecting the carrying from the bar by the jury of depositions or other papers read in evidence, leaves the subject in the sound discretion of the court; and, unless such discretion is clearly abused, the action of the court will not constitute reversible error." *Syllabus* point 5., *Cobb v. Dunlevie*, 63 W. Va. 398, 60 S.E. 384 (1908).

The appellants acknowledge this rule and insist that the trial court's refusal to permit the jury to take the exhibits to the jury room, after the jury had specifically asked

during their deliberations to see them, was an abuse of discretion.

It is not this Court's duty to substitute our belief as to whether it would have been helpful or harmful to allow the jury to take the exhibits to the jury room. Our responsibility on review is simply to determine if the court abused its discretionary power by its decision to refuse the jury's request. We are of the opinion that it did not.

## II

After reviewing the various instructions alleged to have been given or refused erroneously, we believe two of these instructions merit our consideration: Defendants' Maust and Summersville Instructions No. 11 and No. 13A. "Defendants' Maust and Summersville Instruction No. 11" reads as follows:

> "The Court instructs the jury that where the evidence shows that any one of several things may have caused the deaths of plaintiffs' decedents, for some of which Maust and/or Summersville is responsible, and leaves it uncertain as to what was the real cause, then the plaintiffs have failed to establish their case and you should find in favor of the defendants, Maust and Summersville."

The plaintiffs objected to the giving of this instruction, because, in their opinion, it ignored their theory of concurrent negligence. This objection is well-taken. The clause, "and leaves it uncertain as to what was the real cause," is misleading, because of its incompleteness and of its inconsistency with the rule relating to concurrent negligence. Plaintiffs do not have the burden of proving what the "real cause" of the accident was; their burden, under the law of negligence generally, and of concurrent negligence specifically, is to prove whether the alleged negligence of the various defendants together proximately caused or contributed to the death of their husbands. *See, Long v. City of Weirton,* ____ W. Va. ____, 214

S.E.2d 832 (1975); *Lester v. Rose,* 147 W. Va. 575, 130 S.E.2d 80 (1963).

Plaintiffs' Instruction No. 12 correctly states the law of concurrent negligence and consequently, defendants' Instruction No. 11 conflicts with it. Plaintiffs' Instruction No. 12 reads as follows:

"The Court instructs the jury that if you believe from a preponderance of all the evidence in these cases that the combined negligence, if any, of Maust Coal and Coke Corporation, Eugene McKenzie and Thomas McKenzie, formerly engaged in business as Sugar Grove Coal Company, and H. P. Thomas and Summersville Coal Company, a corporation, proximately caused or proximately contributed to the cut-through from Saxsewell No. 8 Mine into the abandoned workings of the Sugar Grove Coal Company No. 4 mine which caused a flooding of the mine and the resulting death of the plaintiffs' decedents, then your verdict shall be for each of the plaintiffs and against all the defendants, unless you further believer (sic) from a preponderance of the evidence that the plaintiffs' decedents were guilty of negligence which proximately contributed to their deaths."

This Court has held in the case of *State Road Commission v. Darrah,* 151 W. Va. 509, 153 S.E.2d 408 (1967) that:

"It is error to give inconsistent instructions, even if one of them states the law correctly, inasmuch as the jury, in such circumstances, is confronted with the task of determining which principle of law to follow, and inasmuch as it is impossible for a court later to determine upon what legal principle the verdict is founded."

*See also, Quality Bedding Co. v. American Credit Indemnity Co.,* 150 W. Va. 352, 145 S.E.2d 468 (1965); *Penix v. Grafton,* 86 W. Va. 278, 103 S.E. 106 (1920); *Cobb v. Dunlevie, supra.* Inasmuch as defendants' Instruction No. 11 misstates the law and conflicts with a proper statement

of the law in plaintiffs' Instruction No. 12, we are of the opinion that the trial court committed prejudicial error in the giving of defendants', Maust and Summersville, Instruction No. 11.

We are also of the opinion that justice demands that a new trial be granted against not only Maust and Summersville, but against all of the defendants below. *See,* 58 Am. Jur. 2d *New Trial* §28 (1971). Granted the erroneous concurrent negligence instruction was submitted by Maust and Summersville and granted the instruction referred strictly to them, nevertheless, it is unlikely that only the plaintiffs' claims against Maust and Summersville were prejudiced by the instruction. The plaintiffs' claims against the other defendants were also based on concurrent negligence, and thus, the erroneous instruction as to the two defendants may have prejudicially affected the plaintiffs' claims as to all of the defendants. This seems particularly true where the trial, as here, was very complex involving potential overlapping liabilities. As stated in *Kord's Ambulance Service, Inc. v. White,* 14 Ariz. App. 294, 482 P.2d 903 (1971),

> "The rights involved in a case may be so intermingled that justice may require ... a new trial as to all parties in the event of the necessity of a new trial as to one of them."

The plaintiffs also assert that Instruction No. 13A, submitted by defendants Maust and Summersville was prejudicial to their case because it misstated the law in this jurisdiction. Instruction No. 13A reads as follows:

> "The Court instructs the jury that when one employer borrows employees from another and uses them in the borrower's own business and controls their services, such employees are the agents of the borrower and not the lender, and the borrower is liable for their acts, and the lender is not liable for them.

> "The Court, therefore, instructs the jury in this case that if you believe from all of the evidence that Gauley Coal and Coke Company bor-

rowed surveys and engineers from Cherry River Coal and Coke Company, Summersville Coal Company or Maust Coal and Coke Company, and if Gauley controlled and directed their work during such times, then Gauley would be responsible for their acts, and Maust and/or Summersville would not be so responsible."

The plaintiffs' objection is well-taken. The language contained in the instruction does misstate the proper rule, which is found in *American Telephone and Telegraph Co. v. Ohio Valley Sand Co.*, 131 W. Va. 736, 50 S.E.2d 884 (1948):

"Under the so called 'borrowed servant' rule a general employer remains liable for the negligent act of his servant *unless it affirmatively appears that he has completely relinquished control* of the servant's conduct from which the alleged negligence arose to the person for whom the servant is engaged in performing a special service." *Id. Syllabus* point 1. (Emphasis supplied.)

The circuit court's failure to include the emphasized language above, or some equivalent thereof, may appear at first glance to be insignificant. However, such language is in fact critical to a proper statement of the law because the law presumes that the right to control employees remains in the general employers, *i.e.*, Maust and Summersville, until total relinquishment is manifested. Consequently, the burden is upon these employers to prove (*i.e.*, affirmatively show) that this right has been completely relinquished to the alleged special employer, *i.e.*, Gauley Coal and Coke Company. The mere sharing or borrowing of survey crews or the partial relinquishment of control by the general employers does not relieve the employer of liability. *American Telephone and Telegraph Co. v. Ohio Valley Sand Co., supra.*

*See also, Master and Servant—Loan of Servant to Third Person—Liability for Negligent Injuries to Strangers by the Servant.* 44 W. Va. L. Q. 75, 77, 78 (1937).

Therefore, Instruction No. 13A was erroneous and prejudicial to the plaintiffs.

### III

In view of our ruling that prejudicial error was committed by the giving of two improper instructions, we need not consider the broad question of whether the jury verdict was contrary to the law and evidence.

### IV

With regard to the last issue, this Court is of the opinion that the trial court was incorrect in directing a verdict for the defendant, Carl C. Holbert. Since the only basis on the record for the directed verdict was the trial court's belief that Holbert was not causally connected to the mine disaster, we can assume for purpose of review that the plaintiffs established a *prima facie* case (*i.e.*, presented sufficient evidence to go to the jury) as to the question of Holbert's negligence. Consequently, only the question of proximate cause is relevant.

It is true that Holbert's alleged negligence was not the sole proximate cause of the miners' deaths. However, his alleged wrongdoing together with the other defendants' alleged negligence may have proximately caused the disaster. In other words, Holbert may have been guilty of concurrent negligence. And as this Court stated in *Long v. City of Weirton,* _____ W. Va. _____, 214 S.E.2d 832 (1975):

> "In a concurrent negligence case, the negligence of the defendant need not be the sole cause of the injury, it being sufficient that it was one of the efficient causes thereof, without which the injury would not have resulted; but it must appear that the negligence of the person sought to be charged was responsible for at least one of the causes resulting in the injury." *Id. Syllabus* point 5.

The facts indicate that if Davis, the mine foreman, had been aware that the abandoned McKenzie mine was nearby, he would have ordered the miners to drill ahead

of the mining. Under this procedure, the miners would have discovered the potentially dangerous situation at the point in distance and time that would have avoided any serious problems. Holbert, who had certified the 1967 map containing the McKenzie mine workings, allegedly was negligent in certifying a later map which did not show these workings,* or in failing to inform Barnett that the workings were missing on the second map. We believe that it was a proper question for the jury to determine whether Holbert's alleged negligence contributed to the mining office map being deficient and thus, to the foreman's failure to drill holes ahead of the mining. This Court has consistently held that:

> "[W]hether the negligence of two or more persons is concurrent and taken together proximately causes or contributes to the injury of another person is, as to all matters of fact, a question for jury determination." *Evans v. Farmer*, 148 W. Va. 142, 156, 133 S.E.2d 710, 718 (1963).

For the reasons expressed, the order of the Circuit Court of Greenbrier County is reversed and the case is remanded for disposition consistent with this opinion.

*Reversed and remanded
with directions.*

---

*Today, *W. Va. Code*, 1931, 22-2-1, as amended, requires in pertinent part that the certified map shall contain: "(15) The known underground workings in the same coalbed on the adjoining properties within one thousand feet of such mine workings and projections ...." This statutory requirement was not in effect in 1968 at the time of the mining disaster.