IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2013 Term

**FILED**

**October 25, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

_____

No. 12-0705

_____

AIG DOMESTIC CLAIMS, INC., n/k/a CHARTIS CLAIMS, INC., and
COMMERCE AND INDUSTRY INSURANCE COMPANY,
Defendants Below, Petitioners

v.

HESS OIL COMPANY, INC.,
Defendant Below, Respondent

AND

_____

No. 12-0719

_____

HESS OIL COMPANY, INC.,
Defendant Below, Petitioner

v.

AIG DOMESTIC CLAIMS, INC., n/k/a CHARTIS CLAIMS, INC., and
COMMERCE AND INDUSTRY INSURANCE COMPANY,
Defendants Below, Respondents

_____

Appeal from the Circuit Court of Harrison County
Honorable Thomas A. Bedell, Judge
Civil Action No. 10-C-20

REVERSED AND REMANDED

_____

Submitted: September 25, 2013
Filed: October 25, 2013

John H. Tinney, Esq.
John H. Tinney, Jr., Esq.
The Tinney Law Firm PLLC
Charleston, West Virginia

Christopher P. Ferragamo, Esq.
Jackson & Campbell, P.C.
Washington, D.C.

Kathleen M. Sullivan, Esq.
Quinn Emanuel Urquhart &
Sullivan LLP
New York, NY
Counsel for AIG Domestic Claims, Inc.,
n/k/a Chartis Claims, Inc., and
Commerce and Industry Insurance Co.

James A. Varner, Sr., Esq.
Debra Tedeschi Varner, Esq.
McNeer, Highland, McMunn
& Varner
Huntington, West Virginia

Michael J. Romano, Esq.
Law Office of Michael J. Romano
Clarksburg, West Virginia
Counsel for Hess Oil Company, Inc.

Christopher J. Regan, Esq.
Bordas and Bordas, PLLC
Wheeling, West Virginia
Counsel for Amicus Curiae West
Virginia Association for Justice

JUSTICE LOUGHRY delivered the Opinion of the Court.

JUSTICE DAVIS, deeming herself disqualified, did not participate in the decision of this case.

SENIOR STATUS JUSTICE MCHUGH sitting by temporary assignment.

SYLLABUS BY THE COURT

1. "This Court reviews the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review." Syl. Pt. 1, *Burke-Parsons-Bowlby Corp. v. Rice,* 230 W.Va. 105, 736 S.E.2d 338 (2012).

2. "Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. Pt. 4, *Sanders v. Georgia-Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976).

3. "An erroneous instruction is presumed to be prejudicial and warrants a new trial unless it appears that the complaining party was not prejudiced by such instruction." Syl. Pt. 2, *Hollen v. Linger*, 151 W.Va. 255, 151 S.E.2d 330 (1966).

4. "'The law presumes . . . that corporations are separate from their shareholders.' Syl. pt. 3 (in part), *Southern Electrical Supply Co. v. Raleigh County National Bank,* [173] W.Va. [780], 320 S.E.2d 515 (1984)." Syl. Pt. 1, *Laya v. Erin Homes, Inc.,* 177 W.Va. 343, 352 S.E.2d 93 (1986).

5. A dissolved corporation that is asserting a claim solely in its corporate name under authority of West Virginia Code § 31D-14-1405(b)(5) (2009) may not recover damages for the personal aggravation, annoyance, and inconvenience of its non-party former shareholders.

6. "'It is error to give inconsistent instructions, even if one of them states the law correctly, inasmuch as the jury, in such circumstances, is confronted with the task of determining which principle of law to follow, and inasmuch as it is impossible for a court later to determine upon what legal principle the verdict is founded.' Opinion, *State Road Commission v. Darrah,* 151 W.Va. 509, 513, 153 S.E.2d 408, 411 (1967)." Syl. Pt. 2, *Burdette v. Maust Coal & Coke Corp.,* 159 W.Va. 335, 222 S.E.2d 293 (1976).

LOUGHRY, Justice:

Through this appeal, Chartis Claims, Inc. and Commercial and Industry Insurance Company (hereinafter referred to as "Chartis Claims," "C&I," or collectively as the "insurance companies") seek relief from an adverse jury verdict[1] returned against them for an unfair trade practices claim[2] asserted by Hess Oil Company, Inc. ("Hess Oil"). Hess Oil separately appealed from the May 3, 2012, order issued by the Circuit Court of Harrison County through which the jury's award of $53 million in punitive damages was reduced by means of remittitur to $25 million.[3] As grounds for their appeal, the insurance companies assert that the trial court committed error by disregarding both the cardinal tenet of corporate separateness and mandatory procedures that govern jury instructions; by giving conflicting jury instructions; by introducing improper evidence of future remediation costs; and by awarding punitive damages. Through its appeal, Hess seeks to reinstate the full amount of punitive damages awarded by the jury. Upon our careful review of this matter, we are convinced that the jury's verdict was affected in a manner prejudicial to the insurance companies due to multiple errors committed by the trial court. As a result, the jury verdict

[1]The jury awarded Hess Oil $5 million in compensatory damages and $53 million in punitive damages.

[2]*See* W.Va. Code § 33-11-4(9) (2011) (setting forth litany of proscribed general business practices pertaining to handling of first-party insurance claims).

[3]For purposes of briefing and oral argument, this Court treated the two appeals at issue separately. Based upon the decision we reach in the appeal taken by the insurance companies (No. 12-0705) that a new trial is required, the appeal filed by Hess Oil (No. 12-0719) is being disposed of simultaneously with the issuance of this opinion.

1

will be set aside and this matter remanded for a new trial.

## I. Factual and Procedural Background

Until 2006,[4] Hess Oil operated an oil distribution business through which it owned underground storage tanks ("USTs") at various service stations. One of those service stations was an Exxon station located in Mt. Storm, West Virginia. Sometime in 1996, Hess Oil applied for and obtained insurance coverage[5] from C&I for environmental remediation claims at its various properties, including the Mt. Storm site.

On or about April 15, 1997, the West Virginia Department of Environmental Protection ("DEP") issued a "Confirmed Release Notice to Comply" ("Notice") with regard to the Mt. Storm site. The entity employed by Hess Oil to investigate the matter, Subsurface, Inc., determined that there was some environmental contamination[6] at the Mt. Storm location. While Hess Oil was insured by the State of West Virginia for UST liability at this time, it

---

[4]In 2006, Hess sold its assets to another firm and then voluntarily dissolved its corporation in May 2008.

[5]The policy was issued retroactive to October 1, 1995, and provided coverage through October 20, 1997.

[6]A former DEP Inspector, John Sneberger, testified: "The extent of the contamination was extremely minimal. It was isolated to the left side of the pit based on the sample data and my field observations. It would be basically something related to most likely overfills and spills, a little bit of soil staining, very minimal."

2

never filed a claim with the state in connection with the April 15, 1997, Notice.[7]  Hess Oil

similarly did not submit a claim to C&I for the April 1997 contamination.[8]

At the time of its policy renewal in October of 1997,[9] Hess Oil submitted either

one or two applications to C&I.  C&I acknowledged receipt of an application dated October

30, 1997, while Hess claims that it also submitted one that was dated October 15, 1997.[10]  In

December 1997, C&I issued a new one-year policy to Hess Oil effective October 21, 1997,

with $1 million of coverage.  Under the "Storage Tank Third-Party Liability, Corrective

Action And Cleanup Policy," C&I agreed to pay "reasonable and necessary costs that the

**Insured** is legally obligated to pay for **Corrective Action** due to **Confirmed Releases**

resulting from **Pollution Conditions** from an **Underground Storage Tank System** which

---

[7]Hess Oil's policy with the state for UST coverage ended on October 1, 1997, when the state terminated its UST insurance program.

[8]Hess Oil viewed the incident as a minor contamination that would be resolved by the installation of new USTs, which were already scheduled to be replaced when the April 1997 Notice was issued.  Testimony was offered at trial that the type of leakage at issue was quite common in the 1990's given the type of UST in use during that period.

[9]*See supra* note 5.

[10]The significance of this dispute bears on whether Hess Oil disclosed to C&I information relative to the April 1997 Notice issued by the DEP.  Whereas the October 15, 1997, application contains an affirmative response to the question of whether Hess Oil has "had any reportable releases or spills . . . as defined by applicable environmental statutes or regulations," the October 30, 1997, application contains a negative answer to the same question.  During closing argument, Hess Oil recognized the possibility that the October 15, 1997, "application" may have been a "draft" document prepared for and sent only to its insurance agent.

3

are unexpected and unintended from the standpoint of the **Insured**." To invoke coverage, claims had to be reported to C&I "in writing, during the **Policy Period** or during the Extended Reporting Period, if applicable."[11]

By letter dated February 23, 1998, the DEP advised Hess Oil regarding "observed changed conditions" at the Mt. Storm site. DEP Inspector Sneberger had visited the site in response to complaints made by members of a neighboring church and confirmed the existence of vapors, petroleum slicks, and globules. Hess Oil provided notice of the potential claim to C&I on January 6, 1999, and coverage was accepted by C&I on July 16, 1999.[12] According to the trial court's order of May 3, 2012,[13] C&I paid $622,000 in corrective action costs for cleanup of the Mt. Storm site as a result of this claim between January 1999 and August 2009. Altering its position regarding the availability of insurance coverage, Chartis Claims[14] disclaimed coverage for cleanup of the Mt. Storm site on August

[11]The insurance companies take the position that the claim, for which they had been providing coverage for ten years, was outside the relevant policy period. Rather than being a claim for a February 1998 incident, they maintain that the contamination at issue was a continuation of the release incident first observed by the DEP in April 1997. The insurance companies discovered the April 1997 Notice through a FOIA request they served on the DEP in June 2009, while attempting to recreate their files pertinent to the Mt. Storm site claim.

[12]Hess Oil sold the Mt. Storm USTs to a third party on May 4, 1998. On May 5, 1998, Hess Oil secured an extended reporting period from C&I, which allowed it to report claims related to the Mt. Storm USTs until May 4, 1999.

[13]This order addressed a myriad of post-trial motions.

[14]Chartis Claims, an indirect subsidiary of AIG, is the corporate entity that handles
(continued...)

4

19, 2009. The disclaimer was based on an alleged inaccuracy in the October 30, 1997, application submitted by Hess Oil and its notice of claim related to the 1998 petroleum release.[15]

As a result of the coverage disclaimer, Ryan Environmental ("Ryan"), an environmental contractor responsible for remediation and cleanup work at the Mt. Storm site, brought a civil action against Hess Oil seeking to collect $252,000 for work its employees had performed. Hess Oil filed cross claims against the insurance companies, seeking both a declaration regarding its entitlement to insurance coverage and also asserting a first-party bad faith claim. In response, the insurance companies filed cross claims against Hess Oil, alleging breach of contract and negligent misrepresentation. Through these cross claims, the insurance companies sought $622,000 for the environmental remediation costs they had paid prior to the filing of the Ryan lawsuit as well as $260,000 to reimburse them for the settlement they reached with Ryan in May 2011.

---

[14](...continued)
claim adjustments for all the separate AIG insurance companies.

[15]In the denial letter, Chartis Claims informed Hess Oil that its disclaimer of coverage was based on the fact that "the Pollution Condition first detected on April 15, 1997 is the same as that reported by the Insured to C&I in January 1999." As support for this position, Chartis Claims referred to the DEP's acknowledgment of the contamination in a September 9, 1997, letter. The insurance companies further rely on the fact that the September 1997 letter from DEP was again referenced in the February 23, 1998, letter from the DEP to Hess Oil advising it of "changed conditions" at the Mt. Storm site.

5

The matter proceeded to trial in December 2011 and, after seven days of trial, the jury awarded Hess Oil $5 million in compensatory damages. Because the jury found that the insurance companies had "willfully, maliciously, and intentionally utilized an unfair business practice" while knowing the claim was proper, the case proceeded to the punitive damage stage and the jury awarded $53 million to Hess Oil in punitive damages. Following a motion of the insurance companies to set aside the punitive damage award based on the absence of evidence of actual malice,[16] the trial court reduced the punitive damage award from $53 million to $25 million. Through the filing of two separate appeals, Hess Oil seeks to have the full amount of the punitive damage award reinstated while the insurance companies seek a grant of judgment as a matter of law[17] or, alternatively, a new trial[18]

---

[16]The insurance companies maintain that the evidence introduced against them on the issue of bad faith settlement practices demonstrated, at best, "insurer 'negligence, lack of judgment, incompetence, or bureaucratic confusion.'" But in no event, they argue, did their actions rise to the necessary level of actual malice. While the trial judge indicated to counsel, outside of the jury's presence, that the evidence introduced in this case did not demonstrate actual malice, once the jury made the determination that the insurance companies acted willfully, maliciously, and intentionally in failing to resolve the claim in good faith, the trial court was unwilling to disturb the jury's decision on the issue of actual malice.

[17]The insurance companies argue that this case should never have proceeded to the jury because Hess Oil failed to introduce evidence that the *corporation*, as opposed to its former shareholders, suffered any injury in connection with the disclaimer of coverage.

[18]Following trial, the insurance companies moved for a new trial on multiple grounds. That motion was denied along with the other post-trial motions in the May 3, 2012, order.

6

## II. Standard of Review

As we recently observed in syllabus point one of *Burke-Parsons-Bowlby Corporation v. Rice,* 230 W.Va. 105, 736 S.E.2d 338 (2012):

> This Court reviews the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

"Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. Pt. 4, *Sanders v. Georgia-Pacific Corp.*, 159 W.Va. 621, 225 S.E2.d 218 (1976).

With regard to the issue of jury instructions in general, this Court reviews both the formulation and giving of jury instructions under an abuse of discretion standard.[19] *See* Syl. Pt. 6, in part, *Tennant v. Marion Health Care Found., Inc.,* 194 W.Va. 97, 459 S.E.2d 374 (1995). However, the giving of "[a]n erroneous instruction is presumed to be prejudicial and warrants a new trial unless it appears that the complaining party was not prejudice[d] by such instruction." Syl. Pt. 2, *Hollen v. Linger*, 151 W.Va. 255, 151 S.E.2d 330 (1966).

---

[19]This same abuse of discretion standard governs the trial court's decisions with regard to evidentiary and procedural rulings; verdict forms; and other matters of trial management. *See generally* Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998); Syl. Pt. 1 *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995).

7

Finally, it is well-settled that our review of punitive damage awards is plenary in nature. *See* Syl. Pt. 16, *Peters v. Rivers Edge Mining, Inc.*, 224 W.Va. 160, 680 S.E.2d 791 (2009) (stating that "this Court will review *de novo* the jury's award of punitive damages and the circuit court's ruling approving, rejecting, or reducing such award"); *see also Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 663, 413 S.E.2d 897, 904 (1991) (recognizing that "detailed appellate review . . . of punitive damages awards [is] important in guaranteeing due process"). With these respective standards in mind, we proceed to consider whether the trial court committed error.

## III.  Discussion

### A.  Corporate Separateness

The insurance companies maintain that the trial court wrongly viewed and treated the former shareholders of Hess Oil[20] as the corporation for evidentiary, damage, and verdict purposes throughout the course of the trial. Critically, the claims in the action at issue were either brought by or against the corporation; the shareholders were not named parties. The record fully reflects both the trial court's failure to acknowledge the distinction between the corporation and its former shareholders as well as the continued objections of the insurance companies to this manner of proceeding.

---

[20]The former shareholders were William Brown, Betty Brown, and the Brown Family Trust.

As we recognized in syllabus point one of *Laya v. Erin Homes, Inc.,* 177 W.Va. 343, 352 S.E.2d 93 (1986), "'[t]he law presumes . . . that corporations are separate from their shareholders.' Syl. pt. 3 (in part), *Southern Electrical Supply Co. v. Raleigh County National Bank,* 173 W.Va. 780, 320 S.E.2d 515 (1984)"; *accord* 1 Fletcher, *Cyclopedia of Corporations* § 25 (2006); 18 C.J.S. *Corporations* § 6 (2007). Not only have we acknowledged that the corporate form is "never [to] be disregarded lightly," but we have explained that this principle applies equally to closely held corporations. *S. States Co-Operative, Inc. v. Dailey,* 167 W.Va. 920, 930, 280 S.E.2d 821, 827 (1981); *S. Elec. Supp. Co. v. Raleigh Co. Nat'l Bank,* 173 W.Va. at 788, 320 S.E.2d at 524 ("Our state law permits close corporations, with one shareholder, so we cannot disregard a corporation solely because it has one or two, and the same, shareholders."). Admittedly, the "legal fiction" that a corporation is "an entity separate and apart from the persons who own it" periodically permits a piercing of the corporate veil for purposes of holding a corporation's shareholders personally liable. Syl. 10, in part, *Sanders v. Roselawn Mem'l Gardens, Inc.,* 152 W.Va. 91, 159 S.E.2d 784 (1968). Given that Hess Oil, a dissolved corporation, is itself seeking recovery,[21] the facts of this case simply do not require, or even suggest, the need for a corporate veil piercing analysis. *See generally Laya*, 177 W.Va. at 349-51, 352 S.E.2d at 99-102 (discussing factors relevant to corporate veil piercing decision).

---

[21]While the insurance companies had initially asserted claims against Hess Oil, just before the case went to the jury, they submitted a stipulation indicating they would not seek recovery from the shareholders for any damages awarded to them in this case or in any other case or action.

This principle of corporate separateness is codified in our law as well. The provision of our business corporation act addressing shareholder liability states that "[u]nless otherwise provided in the articles of incorporation, a shareholder of a corporation is not personally liable for the acts or debts of the corporation. . . ." W. Va. Code § 31D-6-622(b) (2009). Of critical significance to this case is the fact that corporate dissolution does not abrogate the axiom that a corporation and its shareholders are legally distinct. The corporate existence, as well as its protections with regard to shareholder liability, continue even when a corporation is dissolved. As a result, a dissolved corporation may both sue and be sued in its corporate name. *See* W.Va. Code § 31D-14-1405(b)(5) (2009). In the event that claims are brought against a dissolved corporation, those claims are enforceable:

> (1) Against the dissolved corporation, to the extent of its undistributed assets; or
> (2) If the assets have been distributed in liquidation, against a shareholder of the dissolved corporation to the extent of his or her pro rata share of the claim or the corporate assets distributed to him or her in liquidation, whichever is less, but a shareholder's total liability for all claims under this section may not exceed the total amount of assets distributed to him or her.

W.Va. Code § 31D-14-1407(d) (2009).

Despite these clear principles of corporate law, Hess Oil advanced its cross claim at trial as though the non-party former shareholders, William and Betty Brown, were personally liable for the cleanup of the Mt. Storm site upon the disclaimer of coverage and the jury was urged to award damages for the emotional impact the coverage disclaimer had

10

on the Browns.[22]   Notwithstanding repeated objections by the insurance companies to evidence of the Browns' personal injuries, the trial court allowed the jury to consider the effect the coverage disclaimer had on the Browns as both relevant and determinative with regard to the issue of injury and damages.[23]

The record is clear in this case that no injury was suffered by Hess Oil in connection with either the claim initiated by Ryan, which the insurance companies settled with Ryan and obtained a release in favor of Hess Oil, or the cross claims later asserted by the insurance companies against Hess Oil.  Mr. William Brown testified both at his deposition and at trial that Hess Oil suffered no damages.  Describing this testimony as "damaging" in its May 3, 2012, order addressing post trial motions, the trial court opined: "Mr. Brown's testimony reflected an admission he made when deposed:  Hess Oil suffered

---

[22]The Browns were permitted to testify regarding the emotional effects of a possible recovery against them by the insurance companies for the pending claims for negligent misrepresentation and breach of contract.  Though they did not personally incur attorney's fees due to a contingent fee arrangement, the Browns were allowed to testify concerning the emotional effects of such fees, as well as the emotional effects of additional future remediation costs.  *But see infra* note 32 (referring to fee advancement by the Browns as potential item of compensatory damages).

[23]Because the appendix record of this case contains only the statement of Mr. William Brown that no assets were distributed to the shareholders upon the dissolution of the corporation in 2008, there is no foundation for the trial court's ruling the shareholders were subject to potential liability from the insurance companies' cross claims under West Virginia Code § 31D-14-1407(d).  Similarly, while counsel for Hess Oil stated during oral argument that assets were distributed to the former shareholders in 2006, the appendix record filed in this matter does not support this statement.

no damages." As the trial court was quick to acknowledge, "[t]he lion's share of Mr. Brown's testimony related to the proposition that damages should be awarded based upon the impact to Hess's shareholders and to their potential liability stemming from the underlying action herein." After making these critical findings, the trial court proceeded to address as part of its post-trial rulings whether the emotional damages sustained by the former shareholders of Hess Oil were recoverable in this action.

Responding to the insurance companies' position that corporations cannot experience personal damages in the nature of aggravation, annoyance, and inconvenience, the trial court referenced its acknowledgment in a previous order[24] that "little mandatory authority exists on the subject of a corporation's option to demand damages for annoyance and inconvenience."[25] As support for its decision to uphold the personal damages awarded to Hess Oil, the trial court relied upon dicta in *Hayseeds, Inc. v. State Farm Fire and Casualty Co.,* 177 W.Va. 323, 352 S.E.2d 73 (1986); specifically, a hypothetical comparison of the amount of aggravation and inconvenience a family of five might experience as the result of an insurance claim denial in contrast to the relatively minimal effects that such a

---

[24]This order denied the insurance companies' motions for partial summary judgment.

[25]The trial court observed that the insurance companies "reinforce[d] this notion [that corporations are precluded from recovering damages for aggravation, annoyance, and inconvenience] with persuasive common law from outside of West Virginia."

12

coverage denial could potentially have on a corporation.[26]  The *Hayseeds* commentary,

offered by former Justice Neely for illustrative purposes, was aimed at preventing duplicative

damage awards, rather than designed to address whether a corporation may recover damages

of a personal nature.[27]  Instead of being cast in stone as the trial court assumed, the latter

issue remains open to debate.  Given the facts of the case before us, however, it is not

necessary to resolve that matter.

As the record of this case makes clear, without the evidence Hess Oil

introduced concerning the emotional damages suffered by William and Betty Brown, there

---

[26]The contrived scenario was related as follows:

> In allowing an award for aggravation and inconvenience, we do not intend that punitive damages be awarded under another sobriquet.  For example, a large corporation with an in-place, organized collective intelligence that must litigate a claim for several years may suffer substantial economic loss but little aggravation and inconvenience.  On the other hand, a family of five that is required to live for four years in a trailer because an insurance company has declined to pay the fire policy on their $200,000 house suffers little net economic loss but an enormous degree of aggravation and inconvenience.

177 W.Va. at 330, 352 S.E.2d at 80.

[27]As the trial court observed in this case, many courts have found to the contrary. *See, e.g., Pak-Mor Mfg. Co. v. Brown*, 364 S.W.2d 89, 96 (Tex. App. 1962) (holding that corporation could not recover damages for personal annoyance, discomfort, and inconvenience as those damages were suffered by officers and employees of corporation rather than corporation).

would have been little or no evidence of injury for the jury to consider.[28]  As former shareholders and non-parties to the case, the Browns were not the equivalent of Hess Oil for purposes of seeking recovery for injuries purportedly sustained by the corporation.  The contention of Hess Oil that the interests of the former shareholders are wholly merged with those of the corporation upon the dissolution of a corporation is specious.  As discussed above, our corporate statutes make clear that the contrary is true as the legal distinction between a corporation and its shareholders unquestionably continues post dissolution.  *See* W.Va. Code §§ 31D-14-1405(b)(5); 31D-14-1407(d).  And while the former shareholders of a corporation can be held liable up to the amount of assets they received upon liquidation, the trial court appears to have acted on a mere representation that the Browns received assets upon the liquidation of Hess Oil.[29]  The appendix record does not verify either the amount or the fact of such a liquidation.  As it stands, based on the submitted record, and specifically the testimony of Mr. William Brown that no assets were distributed in 2008 upon the dissolution of Hess Oil, there is no basis under West Virginia Code § 31D-14-1407(d) for the trial court's presumption of the existence of shareholder liability.[30]

---

[28]*See infra* note 32.

[29]Referring to West Virginia Code § 31D-14-1407(d), which permits shareholder liability up to the amount of distributed assets, the trial court stated:  "Under this provision, the shareholders were subject to recovery from the AIG Defendants for AIG's cross-claims which totaled nearly $900,000."

[30]We are not questioning the representation made by counsel for Hess Oil during oral argument that the former shareholders received assets in 2006; we simply lack evidence of any such liquidation.  Absent that evidence, there is no legal basis for holding the former

(continued...)

In blindly accepting the *Hayseeds* illustration as controlling, the trial court failed to consider whether that conjectural discourse[31] had any applicability to a dissolved corporation, or even more importantly, to a case in which the former shareholders were not named parties. In our opinion, the trial court's reliance on the hypothetical employed in *Hayseed* fails in both instances. Assuming, *arguendo*, that a corporation could incur damages in the nature of aggravation, annoyance, and inconvenience, the dissolution of that corporation strongly suggests a correlative inability to sustain any such personal damages on the part of the corporation. Confirmation of this point is gleaned from a consideration of how the only aggravation, annoyance, and inconvenience damages that a corporation could hypothetically incur would necessarily be experienced by its employees and shareholders; be specifically associated with and limited to corporate matters; and, typically, be sustained while the corporation is an ongoing concern. And, in the same manner that the personal damages experienced by former shareholders post dissolution are not germane to the issue of *corporate* injury, neither are the personal damages of non-parties who are not subject to personal liability based on the protections afforded them by incorporation. In this case, the admission of the aggravation, annoyance, and inconvenience evidence of non-parties was not

---

[30](...continued)
shareholders legally responsible in this case for any potential recovery from the insurance companies. Moreover, the stipulation the insurance companies submitted, *see supra* note 21, further negates the possibility that the former shareholders could have any potential liability with relation to any claims asserted against Hess Oil by C&I or Chartis Claims.

[31]*See supra* note 26.

15

only of no relevance to the issue of whether Hess Oil sustained damage, but it was also highly prejudicial to the insurance companies as it was essentially the only evidence of injury that Hess Oil relied upon to establish its claim.

Upon our consideration of these critical distinctions, we hold that a dissolved corporation that is asserting a claim solely in its corporate name under authority of West Virginia Code § 31D-14-1405(b)(5) may not recover damages for the personal aggravation, annoyance, and inconvenience of its non-party former shareholders.[32] Accordingly, we find that the trial court erred in its decision that *Hayseeds* provided the necessary authority for an award of personal damages to Hess Oil for the aggravation, annoyance, and inconvenience of its former shareholders. As a result of the trial court's failure to apply the construct of corporate separateness as well as its wrongful reliance on *Hayseeds*, the insurance companies are entitled to a new trial. *See Bartles v. Hinkle*, 196 W.Va. 381, 389, 472 S.E.2d 827, 835 (1996) ("A trial court abuses its discretion if its ruling is based on an erroneous assessment of the evidence or the law.").

## B. Jury Instructions

---

[32]Because the record indicates that the Browns initially advanced their legal counsel $30,000 in expenses, we are unable to conclude that no evidence of compensatory damages was introduced at trial. Additionally, during oral argument counsel for the insurance companies made certain suggestions with regard to this Court's *sua sponte* reduction of the compensatory award that further inhibits any ruling that the insurance companies were entitled to judgment as a matter of law due to the absence of any injury.

16

The insurance companies assert error both with regard to the manner that the jury instructions were handled by the trial court and, specifically, with regard to the giving of two conflicting instructions. On the evening before the case was submitted to the jury, the trial court announced: "I'm going to ask each counsel [to] give me your best six (6) [substantive] instructions and you're going to live with it. And I'll note your exceptions to that and if you don't want to participate in that, I'll choose the six (6) from each side."[33] The record reflects that Hess Oil objected to this numerical limitation but that the insurance companies did not. While this Court admittedly does not approve of the trial court's arbitrary selection of a finite number of jury instructions,[34] we do not further address the imposition of the instructional limitation due to the absence of an objection being raised by the insurance companies on this particular issue. *See State v. Asbury*, 187 W.Va. 87, 91, 415 S.E.2d 891, 895 (1992) ("Generally the failure to object constitutes a waiver of the right to raise the matter on appeal.").

The insurance companies further complain about the fact that they did not get to both review *and* object to the instructions prior to the reading of the instructions to the jury. Upon inquiry, this particular issue merits minimal discussion. Not only were the

---

[33]The trial court observed that after previously asking the parties to narrow down the instructions, Hess Oil had actually increased its submitted instructions from 41 to 56.

[34]While we fully respect the trial court's authority to manage its courtroom and its trial-related proceedings, the limited number of substantive instructions seems unduly restrictive, especially in view of the complexity of this case.

insurance companies provided with a written copy of the instructions in advance of their offering, but the record demonstrates they failed to register any objection to the trial court's announcement that it would permit the parties to place their respective objections to those instructions on the record once the jury began its deliberations. As a result, we will not further address the procedural manner in which the jury instructions were handled by the trial court. *See id.*

In marked contrast to the two preceding issues, the insurance companies fully preserved their objection to the trial court's decision to offer two instructions to the jury on the issue of misrepresentation that are in clear conflict with each other. The applicable law on the issue of insurance misrepresentation was provided in the following instruction given to the jury:

> [T]he AIG Defendants contend that Hess Oil is prevented from recovering under the policy because it or its representatives made a misrepresentation in its application for insurance. To succeed, the AIG Defendants need only prove by a preponderance of the evidence that Hess made a misrepresentation in the application for insurance and [that] those misrepresentations were material to the AIG Defendants acceptance of the risk or to the hazard assumed by AIG. A misrepresentation may result from silence or from the suppression of facts as well as from an affirmative representation.

This instruction fully comports with West Virginia Code § 33-6-7(b), (c) (2011), the statutory provisions under which the insurance companies pursued their claim for misrepresentation

18

against Hess Oil.

The insurance companies argue that the trial court introduced the potential for jury confusion into this case by offering the instruction on misrepresentation offered by Hess Oil. In giving this instruction, the trial court advised the jury about a type of misrepresentation not at issue in the case:

> Misrepresentations, omissions, concealment of facts, and incorrect statements on an application for insurance by an insured *must be knowingly made with an intent to deceive the insurer* and relate to the facts affecting the policy in order to be a legitimate basis for denial of a claim. Therefore, for an insurer to prevail under *W.Va. Code § 33-6-7(a)* the *insurer must establish the insured's specific intent to deceive the insurer . . . .* Accordingly, in order *to prevail, an insurer, AIG must prove* by a preponderance of the evidence *that its insured, Hess Oil knowingly made misrepresentations with a specific intent to deceive AIG* and the misrepresentations must relate to material facts affecting the policy.[35]

Because they did not seek recovery under subsection (a) of West Virginia Code § 33-6-7, the section requiring a showing of an insured's fraudulent misrepresentation, the insurance companies argue there was no foundation for the giving of this particular instruction. We agree.[36] Not only did the instruction in question fail to conform to the facts and pleadings

---

[35]Emphasis supplied.

[36]We reject the position of Hess Oil that the jury did not "even remotely consider[]"

(continued...)

of the case, but it directed the jury to apply the wrong standard–a significantly elevated standard that required a specific intent to deceive–in deciding whether Hess Oil had made a misrepresentation on its insurance application to C&I. As we recognized in *Hollen*, an erroneous instruction is presumptively prejudicial unless the complaining party can be shown not to have been harmed by the giving of the instruction. 151 W.Va. at 255, 151 S.E.2d at 331, syl. pt. 2; *accord Matheny v. Fairmont Gen. Hosp.*, *Inc*., 212 W.Va. 740, 575 S.E.2d 350 (2002).

By giving one instruction that required the insurance companies to prove a material misrepresentation through evidence of a mere failure to report while at the same time providing another instruction which required proof of an intentional failure to report, the jury was presented with contradictory and competing legal standards. The harm that results from instructing a jury in an inconsistent fashion has long been recognized:

> "It is error to give inconsistent instructions, even if one of them states the law correctly, inasmuch as the jury, in such circumstances, is confronted with the task of determining which principle of law to follow, and inasmuch as it is impossible for a court later to determine upon what legal principle the verdict is founded." Opinion, *State Road Commission v. Darrah,* 151

---

[36](...continued)
the issue of misrepresentation. The record of this case demonstrates that the insurance companies vigorously pursued their claims in this case based on misrepresentation or, more specifically, the failure to report. In closing argument, counsel for the insurance companies summarized their position: "They [Hess Oil] have failed to report a Confirmed Release within the applicable policy terms of '96/97 policy and tried to cover it up by asserting a second release in 1998, reported under the extended reporting endorsement."

W.Va. 509, 513, 153 S.E.2d 408, 411 (1967).

Syl. Pt. 2, *Burdette v. Maust Coal & Coke Corp.,* 159 W.Va. 335, 222 S.E.2d 293 (1976).

As we explained in *Darrah*, reversal is required in these instances because inconsistent

instructions create "a distinct tendency to confuse rather than to instruct or enlighten the

jury." 151 W.Va. at 513, 153 S.E.2d at 411.

In its post trial rulings, the trial court acknowledged the error presented by the

two conflicting instructions on misrepresentation. Rather than recognizing the need to grant

a new trial as the result of the error, however, the trial court simply concluded that it did "not

believe this error . . . had an effect on the ultimate verdict."[37] The trial court's conclusion

simply begs the question: there is no way to know that the inconsistent instructions did not

play a part in the jury's decision. Due to the conceivable injection of jury confusion into the

trial as the result of these conflicting instructions, the insurance companies are entitled to a

new trial. *See Burdette*, 159 W.Va. 335, 222 S.E.2d 293, syl. pt. 2.

## C. Future Remediation Costs

As an additional ground of error, the insurance companies cite the trial court's

---

[37]The trial court further opined: "Even if the two instructions were palpably inconsistent with one another, taking the factual circumstances and ultimate disposition of the case into mind, the Court concludes that the instructions, as given, were fair to both parties."

decision to allow Hess Oil to present evidence of future remediation costs at the Mt. Storm site. Mr. Rine, an expert witness for Hess Oil, testified that the amount of funds necessary to complete the site cleanup was between $561,475 to $878,475. During closing argument, counsel for Hess Oil specifically reminded the jury of the amount in excess of $800,000 necessary for future remediation purposes for purposes of calculating the damage award.[38]

Hess Oil takes the position that because the insurance companies failed to resolve the claim within the $1 million policy limits, that it is entitled to seek the full remediation costs as part of its claim. The insurance companies disagree, arguing that they were only liable up to the policy limits. *See Marshall v. Saseen*, 192 W.Va. 94, 101, 450 S.E.2d 791, 798 (1994). And, while an insurer may be held liable beyond its policy limits upon proof that the "policyholder . . . [made] a reasonable demand within the policy limits," the insurance companies maintain that Hess Oil failed to present any evidence that it made any such demand and that they, in response, refused to settle. *Miller v. Fluharty*, 201 W.Va. 685, 698, 500 S.E.2d 310, 323 (1997). As a result, the insurance companies argue there was no basis for the recovery of future remediation costs.[39] They insist that the introduction of

---

[38]In closing argument, counsel for Hess Oil argued to the jury that "the future remediation is part of what the Browns are going to be stuck with here."

[39]Consistent with its position that Hess Oil failed to demonstrate that the former shareholders had any liability for claims brought against the corporation, the insurance companies argue additionally that the necessary predicate for assessing damages for an award of future remediation costs was missing. *See* W.Va. Code § 31D-14-1407(d).

this evidence prejudiced them "by providing a false justification for imposing liability beyond C&I's policy limits" and that Hess Oil was improperly granted "an extralegal windfall."

In ruling on this issue, the trial court cited to evidence that the insurance companies' environmental consultant offered at trial that the cleanup of the Mt. Storm site could have been completed within policy limits had different decisions been made during the cleanup process. This evidence plus testimony adduced that the disclaimer of coverage spawned additional remediation costs convinced the trial court that evidence of future remediation "expenses was highly relevant to the amount of damages at bar."

Having already determined that grounds for reversal exist in this case, we need not base our decision on this issue. We do question, however, whether there was any basis for the jury's consideration of this evidence without any predicate showing that the Browns, as former shareholders, were responsible for the cleanup costs.[40] And, if no clear demand for settlement was made by Hess Oil, this case may fall outside the rulings of this Court that permit recovery for an excess of policy limits. *See Miller*, 201 W.Va. at 698, 500 S.E.2d at 323.

---

[40]*See supra* note 23.

23

## D. Punitive Damages

In light of the fact that we are reversing the jury's verdict in this case, there is no need to conduct a full review of the punitive damage award or the trial court's remittitur of those damages. The entitlement of Hess Oil to punitive damages will be decided anew when this matter is retried. We note, however, that the trial court specifically questioned whether the evidence of this case rose to the necessary level of actual malice required to permit an award of punitive damages.[41] *See McCormick v. Allstate Ins. Co.*, 202 W.Va. 535, 540, 505 S.E.2d 454, 459 (1998) (requiring showing of "high threshold of actual malice in the settlement process" for award of punitive damages in bad faith cases).[42] In view of our remand of this matter for a new trial, there is no need to decide whether the award of punitive damages was improper.

## IV. Conclusion

Based on the foregoing, the judgment order entered by the Circuit Court of Harrison County on January 9, 2012, is vacated; the order of May 3, 2012, denying a new

---

[41]*See supra* note 16.

[42]In challenging the award, the insurance companies cite this Court's statement in *McCormick*, that an award of punitive damages in a bad faith insurance case requires "'intentional injury–not negligence, lack of judgment, incompetence, or bureaucratic confusion.'" 202 W.Va. at 539, 505 S.E.2d at 458 (quoting *Hayseeds*, 177 W.Va. at 330-31, 352 S.E.2d at 80-81). The actions for which Hess Oil asserted bad faith in this case were essentially organizational in nature: improper training of personnel; poor file maintenance; and negligent claim followup.

trial is reversed; and this matter is remanded for additional proceedings consistent with this opinion.

Reversed and Remanded.