**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

J. F. Allen Corporation, a
West Virginia corporation,
Plaintiff Below, Petitioner,

vs)  No. 19-0369 (Kanawha County 14-C-1182)

The Sanitary Board of the City of Charleston,
West Virginia, a municipal utility, and
Burgess and Niple, Inc., an Ohio corporation,
Defendants Below, Respondents,

And

Burgess and Niple, Inc., an Ohio corporation,
Defendant Below, Petitioner,

vs) No. 19-0394 (Kanawha County 14-C-1182)

J. F. Allen Corporation, a West Virginia corporation,
Plaintiff Below/Respondent.

**FILED**
**October 16, 2020**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**MEMORANDUM DECISION**

These consolidated appeals were filed by parties to a breach of contract/negligence action arising out of a sewer improvement project, which action was tried to jury verdict in the Circuit Court of Kanawha County.  The jury rendered a verdict in favor of plaintiff J. F. Allen Corporation (hereinafter "J. F. Allen"),[1] finding that defendant The Sanitary Board of the City of Charleston (hereinafter "the Sanitary Board") breached its contract with J. F. Allen and awarded damages in the amount of $1,300,000.20.  The jury further determined that defendant Burgess & Niple, Inc. (hereinafter "B & N"),[2] had committed professional negligence, awarding damages in the amount of $3,000,000.20, which was reduced by a 10% apportionment of comparative negligence against J. F. Allen, resulting in a net judgment of $2,700,000.18.

Upon post-trial motions filed by the Sanitary Board and B & N (collectively "defendants"), the circuit court granted a new trial on damages only, finding that the jury's verdict was inconsistent, unsupported by evidence, violated the "single recovery" rule, and could not be

---

[1] J. F. Allen is represented by counsel, Charles M. Johnstone, II, and Johnson W. Gabhart, Esq., Johnstone & Gabhart, LLP, Charleston, West Virginia.

[2] B & N is represented by counsel, Peter T. DeMasters, Esq. and Michael A. Secret, Esq., Flaherty Sensabaugh Bonasso, PLLC, Charleston, West Virginia.

1

corrected with remittitur. More specifically, the circuit court found that J. F. Allen had submitted evidence in support of only $1.2 million in damages, yet the jury awarded well in excess of that amount both as against each defendant and in the aggregate. Because of such excess, the court concluded that while it could theoretically remit the verdict, it could not properly apportion damages between the defendants. The circuit court also denied defendants' renewed motions for judgment as a matter of law, finding that in viewing the evidence in the light most favorable to J. F. Allen, the jury's liability verdict should stand. All three parties appealed, which appeals were consolidated for consideration by the Court.[3]

This Court has considered the parties' briefs, oral arguments, and the record on appeal. Upon consideration of the standard of review and the applicable law, we find no substantial question of law presented nor prejudicial error. For these reasons and those set forth herein, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the West Virginia Rules of Appellate Procedure.

## I. Factual and Procedural History

J. F. Allen contracted with the Sanitary Board to serve as contractor for a sanitary sewer replacement project on Kanawha Two-Mile Creek; B & N contracted separately with the Sanitary Board to serve as engineer/architect for the project, providing design and contract administration services including review of disputes and requests for adjustments. The project began on January 9, 2012, and was scheduled for completion by February 1, 2013; however, certain delays occurred which were caused by strikes on unmarked or mismarked underground facilities.

J. F. Allen submitted its request for final payment on November 4, 2013, which payment was issued on November 20, 2013. Nearly six months later, on May 7, 2014, J. F. Allen submitted a "Request for Equitable Adjustment" ("REA") in the amount of $1,309,943.00 pursuant to the contract, for additional costs and expenses resulting from delays occasioned by the underground facility strikes. B & N, as arbiter of disputes under the contract, advised that since the construction phase had been completed, it was "no longer authorized to provide professional services for this project." Accordingly, the REA was rejected, prompting the filing of the instant action.

The parties' handling of the delays caused by the underground utility strikes and the resultant extra costs are primarily at issue in the instant action.[4] In the trial below, J. F. Allen admitted that it did not file a written claim for additional delay costs as described in its contract

---

[3] An appeal was also filed by the Sanitary Board which was consolidated with the instant appeals. Prior to oral argument, the Sanitary Board reached a settlement with J. F. Allen and withdrew its appeal. J. F. Allen likewise withdrew its appeal as against Sanitary Board, leaving only the issues raised with regard to B & N in its appeal.

[4] In addition to the underground utility strikes, J. F. Allen also alleged that work performed by other contractors caused additional delay and that certain restoration and paving work was required that was not otherwise accounted for in the contract price.

with the Sanitary Board. However, witnesses testified that the Sanitary Board's contractual representative—B & N—provided resident project representatives who were onsite daily and maintaining written reports about the strikes. J. F. Allen presented evidence that these representatives were made aware of the resulting delays and told to take careful notes about them for purposes of a future claim for reimbursement. Alan Shreve, an employee of J. F. Allen, testified that he regularly advised B & N representatives of the strikes, delays, and mounting costs and was told, "We'll make you good on it." Testimony was also adduced that change orders for additional costs were handled in a manner that did not strictly comply with the contract, but rather through informal dealings. J. F. Allen contended B & N was advised through a series of letters about delays and interruptions in the work and that the contract required B & N to immediately address such unexpected delays by way of change orders.

In its defense, B & N argued that J. F. Allen admittedly failed to comply with the contract's claims process, which was the exclusive remedy for any additional costs and required timely written notice of such claims. It argued further that the contract expressly provided that any claims not made or identified by submission of the request for final payment were waived. B & N countered that it was not made aware that the strikes were causing significant delays and that, in fact, J. F. Allen reported "no delays" during monthly meetings. It maintained that the project was expected to be finished on time until a few months prior to the original completion date. B & N also adduced evidence that it urged J. F. Allen to submit any claims for additional payments "as soon as possible," but J. F. Allen failed to do so. When J. F. Allen submitted its request for final payment, no outstanding claims were identified as required by the contract. B & N argued that, after the final payment was issued, the "construction phase" as defined by the contract was completed and therefore, its authority to act on any further claims relating to the contract had ended.

*The Contracts*

At trial, the parties introduced the pertinent contracts between J. F. Allen and the Sanitary Board (the "Contractor Agreement") and the Sanitary Board and B & N (the "Engineer Agreement"). With respect to underground facilities, the Contractor Agreement contains a section regarding "Underground Facilities" entitled "Not Shown or Indicated." It states that if underground facilities are revealed that were not shown or indicated in the contract documents, the contractor shall, *inter alia*,

> give written notice to . . . [the] Engineer. *Engineer will promptly review the Underground Facility and determine the extent, if any, to which a change is required in the Contract Documents to reflect and document the consequences of the existence or location of the Underground Facility. . . . If Engineer concludes that a change in the Contract Documents is required, a Work Change Directive or a Change Order will be issued to reflect and document such consequences.* An equitable adjustment shall be made in the Contract Price or Contract Times, or both, to the extent that they are attributable to the existence or location of any Underground Facility that was not shown or indicated or not shown or indicated with

3

reasonable accuracy in the Contract Documents and that Contractor did not know of and could not reasonably have been expected to be aware of or to have anticipated. *If Owner and Contractor are unable to agree on entitlement to or on the amount or extent, if any, of any such adjustment in Contract Price or Contract Times, Owner or Contractor may make a Claim therefor . . . .*

(emphasis added). With respect to the handling of any such "claims," the Contractor Agreement provides that

> [a]ll Claims,[5] except those waived . . . shall be referred to the Engineer for decision. A decision by Engineer shall be required as a condition precedent to any exercise by Owner or Contractor of any rights or remedies either may otherwise have under the [contract] . . . or by Laws and Regulations in respect of such Claims.

(footnote added). The Contractor Agreement further requires that "[w]ritten notice stating the general nature of each Claim shall be delivered by the claimant to Engineer . . . promptly (but in no event later than 30 days) after the start of the event giving rise thereto" and that "[i]n the event that Engineer does not take action on a Claim within said 30 days, the Claim shall be deemed denied." Further, "[n]o Claim for an adjustment in Contract Price . . . will be valid if not submitted in accordance with [the contract]."

With respect to "Final Application for Payment," the Contractor Agreement provides that such application "shall be accompanied by . . . a list of all Claims against Owner that Contractor believes are unsettled[.]" More specifically,

> [t]he making and acceptance[6] of final payment will constitute . . . a waiver of all Claims by Owner against Contractor . . . [and] a waiver of all Claims by Contractor against Owner other than those previously made in accordance with the requirements herein and expressly acknowledged by Owner in writing as still unsettled.

(footnote added).

With respect to the Engineer Agreement state, *inter alia*, that "Engineer will be Owner's representative during the construction period" and "[t]he Construction Phase . . .

---

[5] A "claim" is defined in the contract as a "demand or assertion . . . seeking an adjustment of Contract Price . . . or other relief with respect to the terms of the Contract." The contract provides that "if Owner and Contractor are unable to agree on entitlement to or on the amount or extent, if any, of any adjustment in the Contract Price or Contract Times that should be allowed as a result of such other work, a Claim may be made therefor . . . ."

[6] J. F. Allen never cashed the check for this final payment and therefore argued at trial that it was not "accepted."

will terminate upon written recommendation by Engineer for final payment to Contractors." It provides further that B & N will be the "initial interpreter of the requirements of the contract and all disputes regarding the interpretation of the contract or acceptability of the work are to be submitted to B & N for resolution." In that regard, "[w]hen functioning as interpreter and judge . . . Engineer will not show partiality to Owner or Contractor and will not be liable in connection with any interpretation or decision rendered in good faith in such capacity." Moreover,

> [n]either Engineer's authority or responsibility under [the contract] . . . nor any decision made by Engineer in good faith either to exercise or not exercise such authority or responsibility or the undertaking, exercise, or performance of any authority or responsibility by Engineer shall create, impose, or give rise to any duty in contract, tort, or otherwise owed by Engineer to Contractor . . . .

*The Civil Action and Prior Appeal*

Upon rejection of the REA, J. F. Allen filed suit against the defendants, alleging breach of contract and unjust enrichment [7] against the Sanitary Board and negligence against B & N. More specifically, J. F. Allen contended that B & N failed to investigate or initiate change orders or other reimbursement for delays and costs stemming from the underground facility strikes despite actual notice of these events. It further alleged more generally that B & N failed to properly administer the project by refusing to recommend payment of the REA. As against the Sanitary Board, J. F. Allen alleged that the contract unequivocally required it to reimburse J. F. Allen for delay costs resulting from unmarked or mismarked utilities. Neither defendant filed a cross-claim for indemnification or contribution.[8]

The circuit court dismissed the case against the Sanitary Board, which dismissal was appealed to this Court. *See J. F. Allen Corp. v. Sanitary Bd. of City of Charleston*, 237 W. Va. 77, 785 S.E.2d 627 (2016) ("*J. F. Allen I*"). The Court reversed and remanded, rejecting the circuit court's dispositive conclusion that the contract placed the burden of investigation regarding underground facilities on J. F. Allen. The Court concluded, instead, that the contract "expressly provided for a possible equitable adjustment of the contract price as a result of the existence of an underground facility not shown on the construction plans[.]" *Id*. at 82, 785 S.E.2d at 632. In response to the Sanitary Board's contention that the case was barred by J. F. Allen's failure to comply with the written notice contractual provisions, the Court found that "the complaint alleged that [the Sanitary Board] had actual notice through its onsite representative who documented each event as it occurred [which] . . . . could constitute a written notice if viewed in the light most

---

[7] The circuit court dismissed the unjust enrichment claim and that dismissal was not appealed. It was likewise omitted from the amended complaint.

[8] The Sanitary Board filed a counter-claim against J. F. Allen seeking liquidated damages under the contract for the delays. The jury found that the Sanitary Board was not entitled to such damages.

favorable to J. F. Allen." *Id*. Alternatively, the Court found that factual development may reveal that the Sanitary Board waived the notice requirement "by failing itself to comply with the provision." *Id*. Specifically, the Court concluded:

> [W]hether J. F. Allen did, in fact, satisfy the requirements of the contract, and whether [the Sanitary Board] did, in fact, breach its obligations under the contract or whether elements of the contract were waived or amended by the parties, are *questions of fact* that should only be resolved after the parties have had an opportunity to engage in discovery.

*Id*. at 83, 785 S.E.2d at 633 (emphasis added).

*The Trial*

The trial lasted eight days. In addition to evidence in support of their respective positions outlined *supra*, J. F. Allen presented the testimony of Charles Dutill, an engineering expert offered in the field of design and administration of public works utility construction projects. Mr. Dutill testified that B & N failed to comply with the applicable standard of care in administering the contract. Neither defendant offered an expert in rebuttal.

J. F. Allen also introduced the REA into evidence, along with testimony from its author, Bryon Willoughby. During his testimony, Mr. Willoughby briefly referenced that J. F. Allen was over budget $3 million but did not provide a further itemization of this amount. J. F. Allen's president, Greg Hadjis, also made reference during his testimony to the various effects of the delays caused by underground utility strikes, such as costs of accelerating the project work, extending work hours, increased costs for home office support and management, additional jobsite visits, surveying, and additional costs incurred to maintain its safety program.

During closing arguments, while referencing the verdict form, counsel for J. F. Allen stated:

> If you answer questions 1 and 2 yes, please assess damages. . . . *The damages are the same that we assert against both of these entities.* Okay. *So of this amount, you've got to decide how much you want to put against the Sanitary Board and what you want to put against [B & N].*

(emphasis added). Later, while explaining the verdict form and how to respond to the interrogatories, counsel (referring to the interrogatories against B & N) stated: "Finally, so there would be no [comparative fault] percentage and you put in number 3 hopefully *the rest of the money* . . . ." (emphasis added). Counsel utilized a demonstrative exhibit which identified $1,252,392.43 in damages and made reference to "this number" in explaining the verdict form.

After initial deliberations, the jury submitted a question to the circuit court, asking "Do we assess the dollar amount, Question 3, Part II [damages for breach of contract against the

6

Sanitary Board], and if yes, on what basis?" Later (and apparently before the first question was answered), the jury returned to the courtroom, submitting additional questions. The first question appears to reiterate the unanswered question regarding breach of contract damages, inquiring "What is this amount based on?" After the circuit court answered the question by advising the jury to recall the witnesses, evidence, and exhibits, the foreperson inquired as to whether the jury had the demonstrative exhibit utilized by J. F. Allen's counsel during closing in its possession; the jury had also prepared a written question to this effect. Finally, the court read an additional question referencing the verdict form's instruction to "assign a percentage of fault below," whereupon the jury inquired "what is this and is it based [sic]?" with the foreperson's addition that "[w]hat does the hundred percent equal?" The court re-read the comparative fault instruction to the jury, prompting the foreperson to advise, "That helps."

Thereafter, the jury returned to deliberate and ultimately returned a verdict in favor of J. F. Allen, finding breach of contract by the Sanitary Board and negligence by B & N. Upon entering the courtroom, the foreperson stated, "We got it right, this time." It found 90% negligence against B & N and 10% negligence against J. F. Allen. However, on the verdict form, it only awarded damages in the section addressing the breach of contract by the Sanitary Board, leaving the damages portion of the verdict form pertaining to B & N blank. It awarded damages against the Sanitary Board in the amount of $1,300,000.20.

Defendants both moved for a mistrial, which was denied. The circuit court noted that the jury "got that they [were] supposed to give one recovery but may not have apportioned it among the defendants." The court indicated that it needed to "flesh out" if the jury intended to assess the entire verdict against the Sanitary Board or intended to apportion it between the defendants. Counsel for J. F. Allen agreed, stating, "Yes, your Honor. Did they intend for that to be zero damages [against B & N] or was it their intention that the one-point three-million be split between the defendants[?]" The circuit court reassembled the jury and asked them to return to the jury room and "focus on" question 3, telling them "what I need to know . . . was it your intent to award zero damages against Burgess and Niple?"

After returning for further deliberations, the jury submitted yet another question: "What dollar amount are we assessing for (in question 3) [damages for negligence against B & N] or do we come up with the dollar amount?" Before the question was answered, the jury returned a verdict, having filled in the damages blank against B & N, awarding $3,000,000.20. Upon entering the courtroom, the foreperson allegedly stated "We did get it right this time," although B & N maintains that this statement was not accurately transcribed and that the foreperson actually said, "*If we didn't get it right this time, we quit.*" (emphasis added). Defendants again moved for a mistrial, which the circuit court denied.

On March 20, 2019, the circuit court issued an order granting a new trial on damages and denying the defendants' renewed motions for judgment as a matter of law. As pertained to the new trial on damages, the circuit court found that the verdict was "inconsistent, []not based on the evidence or [] against the clear weight of the evidence, [and] impermissibly award[ed] damages in excess of a single recovery[.]" The circuit court found that J. F. Allen sought only "$1.25 million total in damages for the recovery of a single injury" and that the jury's verdict—both individually against each defendant and collectively—exceeded that amount. The

court further noted the jury's "general confusion and misunderstanding[.]" Further, it found that given the "multiplicity of claims and defendants with respect to the single injury in this case . . . it is impossible for the [c]ourt to discern which of the two Defendants should have to pay if the [c]ourt were to remit damages . . . without additional factual findings."

With respect to the defendants' renewed motions for judgment as a matter of law, the circuit court found that, giving J. F. Allen the benefit of all reasonable inferences, the liability verdicts were proper. These appeals followed.

## II. Standard of Review

Multiple standards of review are implicated here. As to B & N's motion for judgment as a matter of law, "[t]he appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*." Syl. Pt. 1, *Fredeking v. Tyler*, 224 W.Va. 1, 680 S.E.2d 16 (2009). Further,

> [w]hen this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the *evidence was such that a reasonable trier of fact might have reached the decision below*. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party.

Syl. Pt. 2, *Fredeking,* 224 W. Va. 1, 680 S.E.2d 16. (emphasis added). With respect to the circuit court's ruling on the motions for a new trial:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000). "Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. Pt. 4, *Sanders v. Georgia-Pac. Corp.*, 159 W. Va. 621, 225 S.E.2d 218 (1976). With respect to the specific trial errors alleged, those are uniformly reviewed under an abuse of discretion standard. With these standards in mind, we proceed to the parties' arguments.

8

### III. Discussion

The parties' primary assignments of error pertain to the circuit court's determination that the verdict was unsupported by the evidence and therefore a new trial on damages was necessary. However, as a threshold matter, B & N also assigns as error the circuit court's denial of its motion for judgment as a matter of law, arguing that the contractual language warrants judgment in its favor. Finally, B & N also asserts a variety of trial errors including 1) allowing introduction of the REA as substantive evidence; 2) refusing to give an intervening cause instruction; 3) permitting a non-West Virginia licensed engineer to testify as an expert; and 4) allegedly prejudicial remarks made during closing argument.

### 1. JUDGMENT AS A MATTER OF LAW

B & N initially assigns as error the circuit court's refusal to grant it judgment as a matter of law. It argues that, notwithstanding J. F. Allen's allegations of negligence against it, the contractual language entitles it to judgment as a matter of law because 1) J. F. Allen failed to follow the claims process as required by the contract; 2) it had no contractual authority to act after the final payment was rendered; and 3) it did not act in bad faith, as purportedly required for it to be liable under the contract. J. F. Allen responds that B & N owes a professional duty of care irrespective of the contract terms, but also, that B & N's abrogation of its own contractual duties as contained in the Engineering Agreement is evidence of its negligence.

Syllabus point six, in part, of *Eastern Steel Constructors, Inc. v. City of Salem*, 209 W. Va. 392, 549 S.E.2d 266 (2001) holds that "[a] design professional (e.g. an architect or engineer) owes a duty of care to a contractor, who has been employed by the same project owner as the design professional and who has relied upon the design professional's work product in carrying out his or her obligations to the owner . . . ." Importantly, syllabus point seven elaborates, in part, that "the duty of care owed by the design professional to the contractor must be defined on a *case-by-case basis*." *Id*. (emphasis added). In that regard, the *Eastern Steel* Court explained further:

> We note that the exact nature of the specific duty owed by a design
> professional *may* be impacted by provisions contained in the various
> contracts entered among the parties (e.g. the contract between the
> owner and the design professional, and the contract between the
> owner and the contractor), provided that such contractual provisions
> do not conflict with the law.

*Id*. at 401, 549 S.E.2d at 275 (emphasis in original). Despite the Court's emphasis on "may" in this dicta, B & N urges us to read this statement as conclusively holding that contractual language must nonetheless form the outer boundary of liability under a professional negligence cause of action.

This Court has long held:

> "The questions of negligence, contributory negligence, proximate
> cause, intervening cause and concurrent negligence are questions of

9

fact for the jury where the evidence is conflicting or when the facts, though undisputed, are such that reasonable men draw different conclusions from them." Syl. Pt. 2, *Evans v. Farmer*, 148 W. Va. 142, 133 S.E.2d 710 (1963).

Syl. Pt. 10, *Harbaugh v. Coffinbarger*, 209 W. Va. 57, 543 S.E.2d 338 (2000). As discussed *supra*, this Court addressed much of the contract language at issue in *J. F. Allen I*—particularly as pertains to the claims process outlined in the Contractor Agreement—and found that, standing alone, it was not dispositive of even the breach of contract claim against the Sanitary Board. Rather, the Court properly recognized a variety of disputed factual issues which give rise to potential defenses to the contract such as modification and waiver. *J. F. Allen I,* 237 W. Va. at 82, 785 S.E.2d at 632. The facts adduced at trial, viewed in the light most favorable to J. F. Allen, plainly support the availability of these defenses.

Critically, these same factual disputes are centerpieces to J. F. Allen's allegations of professional negligence and B & N's commensurate allegations of comparative negligence. Indeed, the jury's assessment of ten percent comparative negligence to J. F. Allen reflects a consideration of whether its conduct contributed to its losses, as argued by B & N. Moreover, while B & N adamantly insists the contract immunizes it for all but "bad faith" conduct, the appendix record reveals that it submitted no instructions requiring the jury to find "bad faith" in its contract administration, nor did B & N make this argument to the jury in closing. We therefore find that the issues surrounding B & N's liability were matters properly reserved for the jury's consideration and the circuit court committed no error in denying its motion for judgment as a matter of law. However, whether B & N is entitled to have the liability and damages determinations against it set aside and a new trial awarded as a result of irregularities in the jury's verdict is a separate issue, to which we now turn.

2.    *NEW TRIAL*

We turn now to the central, two-pronged issue presented in these appeals. We consider whether the circuit court erred in granting a new damages trial and, if not, whether it erred in granting a new trial on damages *alone*, rather than both liability and damages. The circuit court found that the verdict was "inconsistent," "excessive," and potentially rendered a double recovery for a single injury, but that the liability verdict was not compromised by any deficiency in the verdict and should stand.[9] More specifically, the circuit court concluded that J. F. Allen only introduced evidence to support a damages award of approximately $1.2 million and therefore the

---

[9] As pertains to damages, the court and the parties focus on the "double recovery" prohibition in Syllabus point seven, in part, of *Harless v. First Nat'l Bank in Fairmont,* 169 W. Va. 673, 289 S.E.2d 692 (1982): "A plaintiff may not recover damages twice for the same injury simply because he has two legal theories." While theoretically the verdict could be viewed as a double recovery since the jury split its allegedly excessive verdict between two defendants against whom two different theories of recovery were made, it is ultimately of no consequence whether it was a double recovery or merely excessive. Under either scenario, it must be properly supported by the evidence at trial.

jury's verdict, which exceeded that amount—both individually and in the aggregate—must be set aside.

J. F. Allen concedes that the initial $1.3 million award against the Sanitary Board only "approximates" the damages testified to by Mr. Willoughby and as more fully itemized in the REA. However, to justify the verdict, J. F. Allen argues that there was sufficient evidence of additional losses that "far exceeded" the $1.2 million upon which the jury's approximate $4 million award could be based. It cites two pieces of testimony in support. First, Mr. Hadjis testified that, "In particular, this contract we lost a significant amount of money. *More money than we are claiming here today.*" (emphasis added). Second—and the only specific monetary figure purportedly assigned to those alleged additional losses—was the testimony of Mr. Willoughby, who made the following brief statement:

> . . . [A]gain, when you look at J. F. Allen's cost—what they spent on this job—and I've got reports showing that they've spent $7.1 million. At that time their budget was, I believe, $4.8, so that was $2.5 million not counting the markup they lost. So that is $3 million over budget. So there were a lot of costs incurred by J. F. Allen on this job.

J. F. Allen states that these additional "losses" consisted of additional crews and equipment, "extending working hours" resulting in "increased costs of home office support, management time and attention, additional trips to the site, additional surveying, and maintenance of the safety program." Finally, J. F. Allen suggests that any amount over $1.2 million may constitute the jury's award of general damages for annoyance, aggravation and inconvenience, which has no definite measure.

B & N counters that the jury's verdict was unsupported by any evidence in excess of the approximate $1.2 million as set forth in the REA and that any argument to the contrary is disingenuous since J. F. Allen's counsel specifically told the jury to split the $1.2 million between the two defendants in some manner. As indicated above, after utilizing a demonstrative exhibit itemizing the REA and upon which he had handwritten the total of "$1,252,392.43" counsel stated: "The damages are the same that we assert against both of these entities. . . . So of this amount, you've got to decide how much you want to put against the Sanitary Board and what you want to put against Burgess and Niple."

B & N notes that, in closing, counsel expressly limited his discussion of damages to "this number," pointing to the $1.2 million, and made no reference to the $3 million "over budget" figure mentioned by Mr. Willoughby. In fact, B & N cites to the remainder of Mr. Willoughby's discussion of the over-budget amount wherein he conceded he did not calculate J. F. Allen's losses on this basis because the over budget amount included items which were not attributable to the defendants. Finally, B & N contends that the jury's verdict is not supported by an award of general damages for annoyance and inconvenience because corporations are not entitled to such damages.

With respect to a trial court's decision to set aside a jury's allegedly unsupported verdict, this Court has held:

> "In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true." Syllabus point 5, *Poe v. Pittman*, 150 W. Va. 179, 144 S.E.2d 671 (1965); syllabus point 3, *Walker v. Monongahela Power Company*, 147 W.Va. 825, 131 S.E.2d 736 (1963).

Syl. Pt. 17, *Jordan v. Bero*, 158 W. Va. 28, 210 S.E.2d 618 (1974). However, "[a] verdict which is not supported by the evidence or is so large that it indicates that the jury was influenced by passion, partiality, prejudice or entertained a mistaken view of the case, should be set aside." *Id*. at 60, 210 S.E.2d at 639. *See also* Syl. Pt. 3, *Raines v. Faulkner,* 131 W. Va. 10, 48 S.E.2d 393 (1947) ("A verdict of a jury will be set aside where the amount thereof is such that, when considered in the light of the proof, it is clearly shown that the jury was misled by a mistaken view of the case."); *Linville v. Moss*, 189 W. Va. 570, 575, 433 S.E.2d 281, 286 (1993) (preserving allocation of fault and awarding new trial on damages where "the jury's award . . . must have been based upon some misinterpretation of the law of damages."); *Hall v. Groves*, 151 W. Va. 449, 458, 153 S.E.2d 165, 170 (1967) ("A verdict in excess of the amount which the evidence shows a plaintiff is justly entitled to recover should be set aside by the trial court.").

In that regard, this Court has expressly held that "[i]f the trial judge finds the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice, the trial judge may set aside the verdict, even if supported by substantial evidence, and grant a new trial." Syl. Pt. 2, in part, *Summers v. Martin*, 199 W. Va. 565, 486 S.E.2d 305 (1997). In the instant case, the circuit court found that the verdict must be set aside because the jury "based its verdict on speculation instead of the evidence, when it found [$4.3 million against defendants] despite the fact that J. F. Allen requested approximately $1.25 million in total damages for the single injury alleged." After review of the substantial evidence in this case, we agree.

First, we reject J. F. Allen's contention that the verdict is properly supported by Mr. Willoughby's brief mention of an "over budget" amount of $3 million during the eight-day trial. There was no indication of whether this amount did or did not include the $1.2 million already itemized in the REA and, more importantly, Mr. Willoughby explained that he did not approach the REA from a "total cost" standpoint because "there were other issues on the job that cost them money for which [defendants weren't] responsible." Secondly, irrespective of Mr. Hadjis' generalized discussions of extra manpower, work hours, surveying costs, etc., J. F. Allen introduced no documentation or itemizations for such expenses, which easily lend themselves to calculation. In fact, Mr. Hadjis himself stated that any such expenses were "more" than J. F. Allen was "claiming here today."

Finally, we likewise refuse J. F. Allen's suggestion that the verdict amount in excess of $1.2 million constitutes the jury's award of general damages for aggravation, annoyance,

12

and inconvenience. B & N correctly notes that this Court has never squarely held that corporations may recover such damages.[10] However, we find it unnecessary to pass on this particular issue inasmuch as the jury was not instructed on these types of damages, nor is there any indication that J. F. Allen ever requested any such instruction from the court.

Instead, the only evidence presented in support of J. F. Allen's damages were the itemizations set forth in the REA and its supporting documentation. Certainly, J. F. Allen's counsel's specific request for this amount in closing belies its position on appeal that the verdict was otherwise supported by competent evidence. As this Court long ago explained, "[t]he evidence must afford data, facts and circumstances, reasonably certain, from which the jury may find the actual loss." *Carpenter v. Hyman*, 67 W. Va. 4, ___, 66 S.E. 1078, 1080 (1910).[11] We therefore find no abuse of discretion in the circuit court's award of a new trial on damages.

Having determined that the circuit court did not err in awarding a new trial on damages, we turn to B & N's contention that the jury's questions and difficulties in returning its verdict demonstrate confusion so profound, its liability determinations must also be called into question.[12] With respect to ordering a new trial on damages alone, the Court has held:

> Rule 59(a), R.C.P., provides that a new trial may be granted to any of the parties on all or part of the issues, and in a case where the question of liability has been resolved in favor of the plaintiff leaving only the issue of damages, the verdict of the jury may be set aside and a new trial granted on the single issue of damages.

---

[10] *But cf.* Syl. Pt. 5, *AIG Domestic Claims, Inc. v. Hess Oil Co.*, 232 W. Va. 145, 751 S.E.2d 31 (2013) ("A dissolved corporation that is asserting a claim solely in its corporate name under authority of West Virginia Code § 31D-14-1405(b)(5) (2009) may not recover damages for the personal aggravation, annoyance, and inconvenience of its non-party former shareholders.").

[11] Moreover, the jury, upon returning its initial verdict of only $1.3 million commented, "We got it right this time." As noted by the circuit court, this comment, along with its subsequent inquiries after being sent back to deliberate on its specific award against B & N inquiring what such an award was to be "based on," certainly suggests the jury believed it had fully discharged its duty as to an award of damages with its initial verdict. When it returned with an additional $3 million in damages against B & N, it appears that the jury was attempting to satisfy the circuit court's concern that it improperly completed the verdict form.

[12] B & N casts this argument in terms of the "inconsistency" between the verdict and the evidence, such as to characterize it as an "inconsistent verdict" which typically warrants a retrial on both liability and damages. However, an inconsistent verdict lacks *internal* consistency and, as a result, makes it unclear which aspect of the verdict is flawed and should be set aside. The issue asserted with respect to this verdict is far more straightforward—simply that it was unsupported by the evidence.

Syl. Pt. 4, *Richmond v. Campbell*, 148 W. Va. 595, 136 S.E.2d 877 (1964). However, "it must appear, to justify a new trial limited to a single issue, that such issue is clearly separable from the other issues in the case[.]" *Hall*, 151 W. Va. at 459, 153 S.E.2d at 171.

B & N fails to provide any rationale for why liability and damages are not separable in this case, asserting generally that "lack of understanding regarding the damages shows a lack of understanding regarding the essential elements of the claim from which the damages flow." We disagree with this conclusory assertion and find no demonstrable reason why the jury's liability determinations were in error and should be retried. As this Court observed in *Hall*:

> There has been a full and complete hearing on that branch of the case, and we find no fault with the judgment in respect thereto. The error is in the ascertainment of the amount of damages. The two matters are distinct and separable. When the only error relates solely to the quantum of damages, there would seem to be no sufficient reason for a new trial to determine again the right of recovery. In passing upon the entire case logically the jury would ascertain (1) whether the plaintiff is entitled to recover anything, and (2) if so, how much? The second proposition is wholly separate and distinct from the first

*Id.* at 457, 153 S.E.2d at 170 (quoting *Chafin v. Norfolk and Western Railway Company*, 80 W. Va. 703, 93 S.E. 822, 825 (1917)). The jury's litany of questions pertained solely to damages and there is nothing demonstrably inconsistent or otherwise defective with its liability determination. We therefore affirm the circuit court's determination that the verdict must be set aside and a new trial on damages is warranted.[13]

3.    *ADMISSION OF REA*

As indicated above, B & N also asserts a variety of trial errors, which it contends warrants reversal for a new trial in its entirety. First, B & N claims that the circuit court committed reversible error by permitting the REA to be introduced as substantive evidence. It claims that the REA is a hearsay document prepared by J. F. Allen's expert and was therefore inadmissible as substantive evidence and cumulative. B & N urges that the REA therefore constituted an expert report because it was 1) prepared by J. F. Allen's retained expert, Mr. Willoughby, who called it his "expert report"; 2) submitted seven months after the final payment was tendered for the project; and, most importantly, 3) J. F. Allen's representative testified in deposition that "the expectation

---

[13] B & N further notes that, as observed by the circuit court, "a trial on damages necessitates a complete retrial of the matter," and argues that this necessity supports its argument for a retrial *in toto*. However, as indicated above, prior to oral argument the Court was advised that the Sanitary Board has entered a settlement with J. F. Allen, leaving only B & N as a party defendant. The Court declines to speculate on how this settlement may affect the manner in which a retrial is effectuated and limits its decision to the circuit court's general determination that the damages verdict must be set aside and a new trial on that issue awarded.

14

at the time [of the REA's preparation] was this would be litigated because of [the] request to correct the adjustment."

J. F. Allen maintains this document was merely a business record kept in the ordinary course of its operations and reflected its documentation of a claim for equitable adjustment as part of the contract claims process. As is well-established, "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998).

Rule 803(6) of the Rules of Evidence, commonly known as the "business records" exception, provides that such documents are not hearsay if

> (A)  the record was *made at or near the time* by—or from information transmitted by—someone with knowledge;
> (B)  the record was kept in the course of a *regularly conducted activity* of a business, organization, occupation, or calling, whether or not for profit;
> (C)  making the record was *a regular practice of that activity*;
> (D)  all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E)  neither the source of information nor the method or circumstances of preparation indicate a *lack of trustworthiness*.

(emphasis added). In general, expert reports are inadmissible hearsay documents. *See Wright v. Premier Elkhorn Coal Co.,* 16 S.W.3d 570, 572 (Ky. Ct. App. 1999) ("The reports, prepared in anticipation of litigation by experts retained for the trial, constitute out-of-court statements utilized to prove the truth of the matter asserted."); *Corcoran v. Sears Roebuck & Co.*, 711 A.2d 371, 376 (N. J. Super. Ct. App. Div. 1998) ("[Expert] reports themselves are hearsay and generally are not admissible."). Expert reports may also, as B & N here contends,[14] contain imbedded hearsay, i.e. hearsay within hearsay. West Virginia Rule of Evidence 703's provision that an expert may, under certain circumstances, rely on otherwise inadmissible evidence in forming an opinion, "does not, however, authorize a fact-finder to consider hearsay communications contained in an expert's report for their truth." *In re Soriah B.*, 8 A.3d 1256, 1261 (Me. 2010).

The Court is mindful that it "at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." W. Va. R. Civ. P. 61. In that regard, B & N identifies no prejudice which was occasioned by the introduction of the REA and in fact concedes that it was merely cumulative of Mr. Willoughby's testimony. Accordingly, even if this Court were to find that the REA was improperly admitted as substantive evidence, its admission was plainly harmless and, more importantly, mooted by a new

---

[14] Mr. Willoughby testified that the REA included "J. F Allen's view [of] what had happened. I wasn't there every day. I didn't deal with these folks. . . ."

trial on damages. The REA is purely a damages document, as effectively conceded by the parties. Therefore, in view of our above conclusion that a new trial on damages is warranted, we find it unnecessary to pass on this issue.

## 4.  QUALIFICATION OF EXPERT

Next, B & N claims that J. F. Allen's expert, Charles Dutill, was unqualified to offer opinions because he was not a West Virginia-licensed engineer, citing West Virginia Code § 30-13-2 (1992), which prohibits the "practice of engineering" for non-State-licensed engineers. B & N further argues that permitting Mr. Dutill's testimony was erroneous because he had never worked in this geographical area, had never designed a sewer system like the one at hand, had not administered a contract such as this one in over sixteen years, had never utilized the form contract at issue, and did not consider himself an expert on such a contract. J. F. Allen counters that the statutory provision does not supplant the Rules of Evidence regarding expert testimony and that attacks on the expert's experience and credentialing were merely fodder for cross-examination. We first observe that "[t]he admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong." Syl. Pt. 6, *Helmick v. Potomac Edison Co.*, 185 W. Va. 269, 406 S.E.2d 700 (1991).

West Virginia Code § 30-13-2 makes it unlawful to "practice or to offer to practice engineering in this state, as defined in the provisions of this article . . . ." The "practice of engineering" is defined as including: "consultation, investigation, evaluation . . . of engineering works and systems . . . and the review of construction for the purpose of assuring compliance with drawings and specifications any of which embraces such services or work, either public or private, in connection with any utilities . . . ." W. Va. Code § 30-13-3(e) (1992).

West Virginia Rule of Evidence 702(a) provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Further,

> [i]n determining who is an expert, a circuit court should conduct a two-step inquiry. First, a circuit court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact. Second, a circuit court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify.

Syl. Pt. 5, *Gentry v. Mangum*, 195 W. Va. 512, 466 S.E.2d 171 (1995).

We find that this assignment of error has no merit. Mr. Dutill had over thirty-eight years of experience in engineering, as well as engineering degrees from Cornell University. Any purported inadequacies regarding his experience with contracts such as those at issue was a matter for cross-examination and consideration by the jury. Moreover, West Virginia Code § 30-13-3(e) does not prohibit an unlicensed engineer from providing expert testimony in a court of law. Similar

16

licensure statutes in other states have uniformly been rejected as implying such prohibition—even where the language of those statutes do ostensibly prohibit serving as an expert. *See J.T. Baggerly v. CSX Transp., Inc.,* 635 S.E.2d 97, 103 (S. C. 2006) (rejecting use of licensure statute to disqualify expert engineer as same would "clearly contravene Rule 702" since expert's services "were being offered to a South Carolina jury, not to the State's citizens seeking traditional professional engineering services"); *Tellus Operating Grp., LLC v. Texas Petroleum Inv. Co.*, 105 So. 3d 274, 279 (Miss. 2012) (finding engineer licensure statute "has no bearing on whether a witness is otherwise qualified as an expert" because public safeguarding objective "is not furthered by restricting evidence in a judicial proceeding between private parties"); *Baerwald v. Flores*, 930 P.2d 816 (N. M. Ct. App. 1996) (same).

## 5. *INTERVENING CAUSE INSTRUCTION*

B & N next asserts that the circuit court erroneously refused to instruct the jury on intervening cause, as it requested. B & N sought the instruction on the basis that J. F. Allen's refusal to present a written claim prior to or contemporaneous with the final payment application as required by the contract was the intervening act which caused its losses, irrespective of any alleged negligence on the part of B & N. The circuit court initially agreed to the instruction, but later rejected it on the basis that J. F. Allen's failure to submit a claim was a "deliberate" and not "negligent" act. The court also noted that it believed such a position was well-covered by the instructions on comparative negligence and therefore the instruction was improper. With the latter analysis, we agree.[15]

"As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion." Syl. Pt. 1, in part, *State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d 257 (1996). Further,

> [a] trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense.

---

[15] While we agree an intervening cause instruction was not proper in this case, the circuit court's rationale that an intervening cause must necessarily be a negligent, rather than deliberate, act appears to be based on the language of our caselaw. However, we note that references to "negligent" acts may or may not be merely incidental to the facts of the particular cases, as opposed to a required element of the defense. As discussed *infra*, the Restatement (Second) of Torts § 440 explains that "[a] superseding cause is an *act* of a third person or other *force* . . ." (1965). The Restatement further provides that "[a]n intervening *force* is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed." *Id.* at § 441 (1965). This Court has not had occasion to examine the required nature of the intervening cause in the context of a deliberate act, nor do we find it necessary to do so to resolve the issues presented herein.

17

Syl. Pt. 11, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

In this instance, the circuit court was correct that instructing the jury to assign comparative fault among J. F. Allen and B & N properly accounted for any alleged fault of J. F. Allen. Traditionally, an intervening cause instruction is proper where a *third party's* acts are alleged to extinguish the causal chain.[16] The Restatement (Second) of Torts § 440 explains that "[a] superseding cause is an act of a *third person* or other *force* which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." By implication, this does not include the acts of the plaintiff, against whom a percentage of comparative fault may be applied as the jury sees fit.[17] We note the importance of this distinction between the comparative fault of a plaintiff and that of a third party because "in cases in which a defendant alleges that a plaintiff's negligence proximately caused his or her injury, [reference to both comparative fault] and the reference to independent intervening cause . . . unduly emphasize[s] a defendant's attempt to shift fault to a plaintiff." *Torres v. El Paso Elec. Co.*, 987 P.2d 386, 393, *overruled on other grounds by Herrera v. Quality Pontiac*, 73 P.3d

---

[16] B & N cites two cases for the proposition that a defendant is entitled to an intervening cause instruction based on the conduct of the *plaintiff*: *Sydenstricker v. Mohan*, 217 W. Va. 552, 618 S.E.2d 561 (2005) and *Landis v. Hearthmark, LLC*, 232 W. Va. 64, 750 S.E.2d 280 (2013). Neither provide support for its position. *Sydenstricker* neither created nor cited to a syllabus point regarding allegations of intervening cause against the plaintiff and, in fact, the alleged intervening cause in that case was the conduct of a non-party who had settled. *Id*. at 556, 618 S.E.2d at 565. In *Landis*, the only discussion of whether a party—not *plaintiff*—may constitute an intervening cause is *dicta* from *Sydenstricker* and *Costoplos v. Piedmont Aviation, Inc.,* 184 W.Va. 72, 74, 399 S.E.2d 654, 656 (1990)*. Landis*, 232 W. Va. at 76, 750 S.E.2d at 292. More importantly, *Landis* merely holds that parental immunity does not bar the defense of intervening causation against parents. *See* Syl. Pt. 4, *id*. ("In a product liability action brought for injury to a child, the parental immunity doctrine does not preclude a defendant from asserting, as a defense, that the conduct of a parent was an intervening cause of the child's injuries."). It did not examine the question of whether an intervening cause instruction is appropriate when the intervening cause asserted is the conduct of the plaintiff.

[17] *See also* Restatement § 442(d) and (f) (identifying considerations for determining whether conduct is an intervening force including whether "the operation of the intervening force is due to a *third person's act or to his failure to act*" and "the degree of culpability of a wrongful act of a *third person* which sets the intervening force in motion" (emphasis added)). *See also Von der Heide v. Com., Dep't of Transp*., 718 A.2d 286, 288 (Pa. 1998) ("Superseding cause allows the unforeseeable acts of a third party, someone or something other than the plaintiff or the defendant, to supplant the defendant's conduct as the legal cause of the plaintiff's injuries."); *Brooks v. Logan*, 903 P.2d 73, 80-81 (Idaho 1995), *superseded by statute on other grounds as stated in Carrier v. Lake Pend Oreille Sch. Dist*., 134 P.3d 655 (Idaho 2006) ("[T]here is no allegation that a third party or some 'other force' was the intervening, superseding cause . . . . In a situation such as this, we believe the question is more appropriately one of comparative negligence.").

181 (N. M. 2003). As the *Torres* court explained, an improper instruction regarding plaintiff's fault under the auspices of intervening cause creates "an unacceptable risk that the jury will inadvertently apply the common law rule of contributory negligence" which would bar recovery altogether. *Id*. at 393.

We therefore conclude that the circuit court committed no error in refusing B & N's intervening cause instruction.

## 6.    REMARKS IN CLOSING

Finally, B & N claims that J. F. Allen's counsel improperly argued to the jury that neither defendant offered its own expert, thereby improperly reversing the burden of proof to the B & N. More specifically, B & N complains of the following statements made in closing:

> Now, the engineer who is supposed to be the independent arbiter, again, *we're the only person that put on an expert*. Our expert said that for those same sections, it was negligence for the engineer not to act. It was negligent for them not to recommend payment.
>
> [Counsel for B &N] doesn't like our expert, who was qualified by the Judge, and testified—the only person who testified. *They couldn't get an expert to refute it.* Nobody from management— you'd think somebody—Mr. Richards or somebody would come in and say, that's wrong.

(emphasis added). J. F. Allen counters that B & N failed to object at the time of the comments and therefore waived any error; B & N attempts to cure its clear failure to object by arguing that it raised the issue in *post*-trial motions.

This assignment of error has no merit. "Failure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court." Syl. Pt 6, *Yuncke v. Welker*, 128 W. Va. 299, 36 S.E.2d 410 (1945); *see also Rowe v. Sisters of Pallottine Missionary Soc'y*, 211 W. Va. 16, 26 n.6, 560 S.E.2d 491, 501 n.6 (2001) (declining to review remarks where "counsel did not make a contemporaneous objection to any of these arguments, nor did the appellant ask for a curative instruction before the jury retired for its deliberations"); *State v. Asbury*, 187 W. Va. 87, 91, 415 S.E.2d 891, 895 (1992) ("Generally the failure to object constitutes a waiver of the right to raise the matter on appeal.").

## IV. Conclusion

For the foregoing reasons, the March 20, 2019, order of the Circuit Court of Kanawha County ordering a new trial on damages and denying B & N's motion for renewed judgment as a matter of law is hereby affirmed.

Affirmed.

**ISSUED**:  October 16, 2020

**CONCURRED IN BY**:
Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison